STEPHEN YAGMAN (SBN 69737)
filing@yagmanlaw.net
YAGMAN + REICHMANN, LLP
333 Washington Boulevard
Venice Beach, California 90292-5152
(310)452-3200

Presented on behalf of Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| PEOPLE OF LOS ANGELES WHO ARE UN-HOUSED, AS A CLASS REPRESENTED BY C. FINLEY, *etc*., <br><br> Plaintiff, <br><br> v. <br><br> **ERIC MICHAEL GARCETTI**, *et al*., <br><br> Defendants. | 2:21-cv-06003-DOC(KESx) <br><br> **PLAINTIFFS' *CORRECTED* REPLY ON PLAINTIFFS' *EX PARTE* APPLICATION FOR ORDER RECONSIDERING MINUTE ORDER DENYING DAMAGES CLASS CERTIFICATION BY (1) NAMING PLAINTIFF FINLEY AS A CLASS REPRESENTATIVE, AND (2) REVERSING RULING THAT A DAMAGES MODEL IS REQUIRED FOR A DAMAGES CLASS CERTIFICATION** <br><br> Judge David O. Carter |

On July 31, the court determined which plaintiffs would be class representatives, and omitted plaintiff Finley, and also ruled that a damages model[1] was required for a damages class certification, and plaintiffs apply to correct those two rulings.

---

[1] As to the court's heading in part D, it may be that the court first tentatively decided that there should be a damages class, then changed its mind, and mistakenly did not change part D's heading from "**Does Meet**" to its opposite.

## MEMORANDUM OF POINTS AND AUTHORITIES

*Ex parte* applications are meant to address emergencies, and the court having not named plaintiff Finley as a class representative is an emergency because the discovery cutoff date is Aug. 30 and all other pretrial dates have been set. Also, an emergency is created by the denial of plaintiffs' motion for a damages class. Defendants can suffer no prejudice, because they fully have briefed all of the issues.

Plaintiffs anticipated all of defendants' arguments in opposition, and here comment only briefly, in response to the opposition.

No case cited by the court or by the defense requires that a damages model shall have been provided, as argued in the application, because plaintiffs established predominance. And, plaintiffs now have provided a "model." *See* discussion of tents in application.

Plaintiffs did not "miss the part of the opposition brief [to the certification motion] where defendants wrote 'Plaintiffs must also demonstrate that 'damages are capable of measurement on a classwide basis. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)." [*Sic*, as to placement of quotation marks.] This does *not* say anything about, much less mention at all, a required, global presentation of a damages model in all cases. Defendants admit that "[e]ven assuming the truth of that assertion [that *Comcast*] 'goes to the efficacy of a hypothetical damages model when one has been presented,", "it did not relieve the Plaintiffs of the requirement to demonstrate that 'damages are capable of measurement on a classwide basis[.]"Opp. at 3:6-11. Plaintiffs have shown that damages are capable of measurement on a classwide basis, if only as to the loss of tents. (Other damages can be shown on a plaintiff-by-plaintiff basis submitting claims, and/or their determination by a special master. *See e.g. Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996) (it was estimated that the size of class was 10,000 people, and following trial on liability and total compensatory damages, a total of 10,059

detailed and certified claim forms were received, and in the end, 9,539 of the claims were found valid and awarded damages). No damages model is required, and there was none in *Hilao*. Damages must be proved at trial, and need not be shown with a model on certification. In *Hilao*, the court held:

## IX. Methodology of Determining Compensatory Damages

The Estate challenges the method used by the district court in awarding compensatory **damages** to the class members.

*A. District Court Methodology*
The district court allowed the use of a statistical sample of the class claims in determining compensatory damages. In all, 10,059 claims were received. The district court ruled 518 of these claims to be facially invalid, leaving 9,541 claims. From these, a list of 137 claims was randomly selected by computer. This number of randomly selected claims was chosen on the basis of the testimony of James Dannemiller, an expert on statistics, who testified that the examination of a random sample of 137 claims would achieve "a 95 percent statistical probability that the same percentage determined to be valid among the examined claims would be applicable to the totality of claims filed". Of the claims selected, 67 were for torture, 52 were for summary execution, and 18 were for "disappearance".

*1. Special Master's Recommendations*
The district court then appointed Sol Schreiber[2] as a special master (and a court-appointed expert under Rule 706 of the Federal Rules of Evidence). Schreiber supervised the taking of depositions in the Philippines of the 137 randomly selected claimants (and their witnesses) in October and November 1994. These depositions were noticed and conducted in accordance with the Federal Rules of Civil Procedure; the Estate chose not to participate and did not appear at any of the depositions. (The Estate also did not depose any of the remaining class members.)

---

[2] Judge Schreiber, 1929-2016, was a federal magistrate judge in the Southern District of New York, and was plaintiffs' counsel's professor of civil advocacy at Fordham University School of Law, in 1973-74.

Schreiber then reviewed the claim forms (which had been completed under penalty of perjury) and depositions of the class members in the sample. On the instructions of the district court, he evaluated

(1) whether the abuse claimed came within one of the definitions, with which the Court charged the jury at the trial ..., of torture, summary execution, or disappearance; (2) whether the Philippine military or paramilitary was ... involved in such abuse; and (3) whether the abuse occurred during the period September 1972 through February 1986.

He recommended that 6 claims of the 137 in the sample be found not valid.[8] Schreiber then recommended the amount of damages to be awarded to the 131 claimants. Following the decision in *Filartiga v. Pena–Irala,* 577 F.Supp. 860, 863 (E.D.N.Y.1984), he applied Philippine, international, and American law on damages. In the cases of torture victims, Schreiber considered:

(1) physical torture, including what methods were used and/or abuses were suffered; (2) mental abuse, including fright and anguish; (3) amount of time torture lasted; (4) length of detention, if any; (5) physical and/or mental injuries; (6) victim's age; and (7) actual losses, including medical bills.

In the cases of summary execution and "disappearance", the master considered

(1) [the presence or absence of] torture prior to death or disappearance; (2) the actual killing or disappearance; ... (3) the victim's family's mental anguish[;] and (4) lost earnings [computed according to a formula established by the Philippine Supreme Court and converted into U.S. dollars].

The recommended damages for the 131 valid claims in the random sample totalled $3,310,000 for the 64 torture claims (an average of $51,719), $6,425,767 for the 50 summary-execution claims (an average of $128,515), and $1,833,515 for the 17 "disappearance" claims (an average of $107,853). Schreiber then made recommendations on damage awards to the remaining class members. Based on his recommendation that 6 of the 137 claims in the random sample (4.37%) be rejected as invalid, he recommended the application of a five-per-cent invalidity rate to the remaining claims. He then performed the following calculations to determine the number of valid class claims remaining:

| Torture | Summary Execution | Disappearance |
|---------|-------------------|---------------|

|  |  |  |  |
|---|---|---|---|
| Claims Filed | 5,372 | 3,677 | 1,010 |
| Facially Invalid Claims | −179 | −273 | −66 |
| Remaining Claims | 5,193 | 3,404 | 944 |
| Less 5% Invalidity Rate | −260 | −170 | −47 |
| Valid Claims | 4,933 | 3,234 | 897 |
| Valid Sample Claims | −64 | −50 | −17 |
| Valid Remaining Claims | 4,869 | 3,184 | 880 |

He recommended that the award to the class be determined by multiplying the number of valid remaining claims in each subclass by the average award recommended for the randomly sampled claims in that subclass:

|  | Torture | Summary Execution | Disappearance |
|---|---|---|---|
| Valid Remaining Claims | 4,869 | 3,184 | 880 |
| x Average Awards | $51,719 | $128,515 | $107,853 |
| Class | $251,819,81 | $409,191,76 | $94,910,640 |

| Awards | 1 | 0 |
| --- | --- | --- |

By adding the recommended awards in the randomly sampled cases, Schreiber arrived at a recommendation for a total compensatory damage award in each subclass:

| | Torture | Summary Execution | Disappearance |
| --- | --- | --- | --- |
| Class Awards | $251,819,811 | $409,191,760 | $94,910,640 |
| Sample Awards | $ 3,310,000 | $ 6,425,767 | $ 1,833,515 |
| TOTALS | $255,129,811 | $415,617,527 | $96,744,155 |

Adding together the subclass awards, Schreiber recommended a total compensatory damage award of $767,491,493.

### 2. Jury Proceedings

A jury trial on compensatory damages was held in January 1995. Dannemiller testified that the selection of the random sample met the standards of inferential statistics, that the successful efforts to locate and obtain testimony from the claimants in the random sample "were of the highest standards" in his profession, that the procedures followed conformed to the standards of inferential statistics, and that the injuries of the random-sample claimants were representative of the class as a whole. Testimony from the 137 random-sample claimants and their witnesses was introduced. Schreiber testified as to his recommendations, and his report was supplied to the jury. The jury was instructed that it could accept, modify or reject Schreiber's recommendations and that it could independently, on the basis of the evidence of the random-sample claimants, reach its own judgment as to the actual damages of those claimants and of the aggregate damages suffered by the class as a whole.

The jury deliberated for five days before reaching a verdict. Contrary to the master's recommendations, the jury found against only two of the 137 claimants in the random sample. As to the sample claims, the jury generally adopted the master's recommendations, although it did not follow his recommendations in 46 instances. As to the claims of the remaining class members, the jury adopted the awards recommended by the master. The

district court subsequently entered judgment for 135 of the 137 claimants in the sample in the amounts awarded by the jury, and for the remaining plaintiffs in each of the three subclasses in the amounts awarded by the jury, to be divided pro rata.

*Id*. at 782-84 (footnotes omitted). This is the proper methodology used to calculate compensatory damages. In the instant case, it will be significantly less complicated than in *Hilao*.

That this is the proper methodology is borne out by *Nguyen v. Nissan North America, Inc.*, 932 F.3d 811, 817 (9th Cir. 2019), in which the court held:

> *Comcast* did not alter our holding that individualized damages issues ***do not alone defeat certification***. *See Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015) ("*Yokoyama* remains the law of this court, even after *Comcast*."); *see also Jimenez*, 765 F.3d at 1168 ("So long as the plaintiffs were ***harmed by the same conduct***, disparities in how or by how much they were harmed did not defeat class certification.").
> But *Comcast* requires that "plaintiffs [ ] be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013); *see also Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120 (9th Cir. 2017) ("[P]laintiffs must show that 'damages are capable of measurement on a classwide basis,' in the sense that ***the whole class suffered damages traceable to the same injurious course of conduct underlying the plaintiffs' legal theory***." (quoting *Comcast*, 569 U.S. at 34, 133 S.Ct. 1426)). In short, "[u]ncertainty regarding class members' damages does not prevent certification of a class as long as a valid method has been proposed for calculating those damages." *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017), *rev'd on other grounds*, ——— U.S. ——, 139 S. Ct. 710, 203 L.Ed.2d 43 (2019).

(Emphases added.) Here, plaintiffs meet the *Pulaski & Middleman, LLC* test.

//

//

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Last, what the Rutter Guide "suggests" is not the law. Here, the two *Finley* actions were not consolidated only for trial, but were consolidated for all purposes, so that plaintiff Finley by operation of law and that principle became a plaintiff for all purposes (but not for her claims in the first action, that were dismissed). The two cases were merged by virtue of the manner in which they were consolidated. Defendants admit, citing a Sixth Circuit case, that "how consolidation occurred" is determinative on the issue of whether consolidation results in merger. Especially when consolidation occurs by motion, there is merger, and only when the court consolidates on its own is there no merger. Here, consolidation occurred as a result of plaintiff Finley's consolidation motion, so that there is merger, based on defendants' cited cases. The cases cited as to personal jurisdiction are wholly inapposite.

Plaintiff Finley should be added as a class representative, and a damages class should be certified, either absent a model or using the proposed tent model. The methodology used in *Hilao* is appropriate and should be used in the instant matter: the jury may award compensatory damages, as in *Hilao*, based on sample testimony from plaintiffs and class members.

Respectfully submitted,

**YAGMAN + REICHMANN, LLP**

By:  /s/  Stephen Yagman
**STEPHEN YAGMAN**