```
                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
                    WESTERN DIVISION - LOS ANGELES



PEOPLE OF CITY OF LOS ANGELES  ) CASE NO: 2:21-cv-06003-DOC-KES
WHO ARE UN-HOUSED,             )
                               )              CIVIL
              Plaintiff,       )
                               )        Santa Ana, California
       vs.                     )
                               )      Monday, February 3, 2025
ERIC MICHAEL GARCETTI, ET AL,  )
                               )     (12:11 p.m. to 1:32 p.m.)
              Defendants.      )
_____)


                          HEARING RE:
              MOTION FOR SUMMARY JUDGMENT [DKT.NO.394]


               BEFORE THE HONORABLE DAVID O. CARTER,
                   UNITED STATES DISTRICT JUDGE



APPEARANCES:              SEE PAGE 2


Court Reporter:           Recorded; CourtSmart


Courtroom Deputy:         Karlen Dubon


Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, TX 78468
                          361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.
```

2

**<u>APPEARANCES</u>:**


For Plaintiffs:           STEPHEN YAGMAN, ESQ.
                          Yagman & Reichmann
                          333 Washington Boulevard
                          Venice Beach, CA 90292
                          310-452-3200

For Defendants:           EMERSON KIM, ESQ.
                          Los Angeles City Attorney's Office
                          City Hall East
                          200 N. Main Street
                          Suite 675
                          Los Angeles, CA 90012
                          213-978-7000

3

1    **Santa Ana, California; Monday, February 3, 2025; 12:11 p.m.**

2        THE COURT:  Counsel, we're going to go on CourtSmart

3    in just a moment.

4        Okay, we're on CourtSmart and counsel are present.

5    On the matter of People of Los Angeles who are Un-Houses versus

6    Eric Garcetti, 21-06003.

7        Counsel, I'm going to let my staff go to lunch.  Is

8    it acceptable that we go on CourtSmart or do you want to wait

9    until the afternoon for a court reporter?

10        MR. YAGMAN:  I don't know what CourtSmart is.

11        THE COURT:  Explain what CourtSmart is.

12        THE CLERK:  Instead of having a live court reporter,

13    it's going to be recorded on a digital recording device.

14        MR. YAGMAN:  It is then possible to get a transcript?

15        THE COURT:  Yes.

16        MR. YAGMAN:  Then that's fine.

17        MR. KIM:  That's fine, Your Honor.

18        THE COURT:  All right.  It's just a courtesy to you.

19        Now, Karlen, goodbye.  Go to lunch.

20        Is it acceptable to you that we work through lunch so

21    you don't have to come back at 1:00 o'clock?  Because I've got

22    a trial at 1:00 o'clock and you might be here till 5:00

23    o'clock.  Can you work through lunch with me?

24        MR. KIM:  Yes, Your Honor.

25        MR. YAGMAN:  Yeah.  I thought the trial was at 1:30.

4

1          **THE COURT:**  Oh, then it's at 1:30.  Karlen, when's

2    the trial?

3          **THE CLERK:**  1:00 o'clock.

4          **THE COURT:**  1:00 o'clock.

5          **MR. YAGMAN:**  That's the Nichols case, right?

6          **THE COURT:**  Yeah.

7          **MR. YAGMAN:**  I know the attorneys.

8          **THE COURT:**  Okay, it's 1:00 o'clock.  Acceptable if

9    we work through lunch?

10          **MR. YAGMAN:**  Yes.

11          **THE COURT:**  To try to finish this?  All right.

12          **MR. KIM:**  Yes, Your Honor.

13          **THE COURT:**  At the time that the plaintiff filed the

14    complaint, there were numerous allegations concerning the what

15    I'm going to call "the bin" location.  And I'm going to read to

16    you what I wrote on the motion to dismiss because there we have

17    a much different standard.  I'm to base my decisions based upon

18    the allegations in the complaint.  This is a different

19    procedure, it's summary judgment.  But clear back then on

20    Docket Number 319, you have it?  Three-one-nine?  Okay.  On

21    page 24, I said:

22          "The procedures and processes Defendants describe,

23          however, stand in stark contrast to the grim reality

24          that Plaintiff's describe.

25          As a threshold matter, the Court has substantial

1          doubts about the non-profitability to regularly

2          locate individuals who have no permanent address."

3          And on Page 24 at Line 26, I continued and stated:

4          "In addition to the inhumanity of displacing the

5          unhoused, confiscating their essential personal

6          documents and providing no resources, leaving

7          individuals who are often mentally ill or physically

8          incapacitated with no choice but to transfer across

9          Los Angeles to recover their necessities is likely to

10         be disruptive for neighborhoods they must pass

11         through along their route."

12         On Line 6 on Page 25, the Court continued:

13         "As the Court previously emphasized, an unhoused

14         person's belongings are essential to their dignity

15         and ability to obtain healthcare, employment and

16         housing.  And because it is often all they have,

17         their belongings necessarily implicate their right to

18         liberty.

19         The Court finds that compelling individuals with no

20         money or means of transportation to trek along miles

21         of congested freeways and highways to retrieve their

22         rightful possessions shocks the conscience on public

23         health and safety grounds; particularly when car

24         accidents are a leading cause of death and injury for

25         the unhoused.

6

1          Further, the reluctance of some neighborhoods and

2          council districts to take responsibility and provide

3          resources for the unhoused in their own communities

4          has led to years of poor neighborhoods absorbing the

5          impact, thereby worsening citywide inequality.

6          Funneling the unhoused to skid row by confiscating

7          and relocating their essential possessions places a

8          disproportionate and unsustainable burden on Downtown

9          Los Angeles.  And that specifically would have been

10         Council District 14."

11         **MR. YAGMAN:**  Your Honor, are you reading from Docket

12  317?

13         **THE COURT:**  Three-nineteen.

14         **MR. YAGMAN:**  Thank you.

15         **THE COURT:**  All right.  Now, that decision though was

16  based upon a complaint and our 12(b) standard is much different

17  than our summary judgment standard.

18         Now, pulling the declaration of Eric Serin, which is

19  Docket 399, what we've been researching throughout the morning,

20  going back over the numerous documents that have been filed is

21  where there's a declaration or statement that items were taken.

22  And in his declaration -- I'll just read the entire paragraph,

23  beginning at Paragraph -- or Line 6.

24         "I've lived on the streets of Los Angeles mostly in

25         tents on the sidewalks, sometimes in Playa Vista just

1           south of Marina del Rey on Jefferson Boulevard which

2           is just south of Venice Beach, alongside the former

3           Jefferson Boulevard, unhoused, vehicle, clothes,

4           encampment.

5           And my personal belongings were stolen from me by the

6           City of Los Angeles and City of Los Angeles

7           Sanitation workers and enforced by LAPD officers.

8           And I would have needed to have traveled 34.44 miles

9           roundtrip to get back the property stolen from me."

10          Now, "stolen" I take as a word that also means taken

11  or confiscated.

12          On Page 2 of his declaration at Line 5, he states:

13          "All confiscated property that unhoused persons

14          cannot pack within 15 minutes, including tents and

15          identification, are taken to the bin, a facility in

16          the skid row area and Downtown Los Angeles.  The bin

17          is 17.4 miles from my residence, meaning that I would

18          need to make a roundtrip journey of almost 35 miles

19          across multiple city districts and neighborhoods to

20          retrieve my stolen belongings."

21          Then he goes down to Line 12:

22          "Only 17 percent of people ever claim their

23          belongings and such the City is aware that more than

24          4/5ths, 83 percent of the belongings it confiscates

25          never are picked up by their owners and ultimately

8

1          are destroyed after the 90-day waiting period.  The

2          City had four additional storage areas located

3          throughout the city but the zone protocols sent

4          confiscated belongings solely to the bin."

5          All right.  Now hold on.

6          In the declaration of David Jacobs on Line 21 --

7  strike that.  Let me begin at Line 16.

8          "By November 2022, my tent and all my belongings

9          frequently had been confiscated by the LAPD,

10          including Defendant Monique Contreras and sanitation

11          workers.  And I asked Mr. Yagman he would help me

12          with that and he agreed to file a lawsuit.

13          Mr. Yagman's partner, Marion Yagman, at that time

14          replaced my tent.  Most recently, Officer Contreras

15          accosted me and confiscated all my belongings on

16          September 2nd and that incident is the subject of a

17          new lawsuit by me against her and others that is

18          pending before Judge Andre Birotte."

19          I believe I've taken that case.  That's Jacobs versus

20  Bass.

21          **MR. YAGMAN:**  Yes.

22          **THE COURT:**  All right.

23          "From November 22nd, 2022 to the present date, my

24          tent and all my belongings were confiscated by

25          Officer Contreras and others at least eight times."

1          The City has represented that you --

2          **MR. YAGMAN:**  Your Honor, excuse me.  There's one more

3   declaration that the Court hasn't referred to and let me --

4   it's Document 397 and it's a declaration of Crystal Finley and

5   she says essentially the same thing.  It's Page 15 of 20 of the

6   original submission.

7          **THE COURT:**  Can you bring that up?

8          **MR. YAGMAN:**  And she says in essence at the end of

9   it:

10         "And she, returning to -- referring to Officer

11         Contreras -- took our tent, all of our belongings,

12         including our clothing and bedding."

13         And on the next page her husband says the same thing.

14  He's not a party to this action.

15     **(Pause)**

16         I'm going to read from the second paragraph verbatim.

17         "Today, May 7th, 2024, at about noon, LAPD Officer

18         Contreras and about 10 other LAPD officers came to

19         where I and my husband Ray White (ps) were living in

20         a tent in Venice near Rose Avenue and Main Street,

21         across from the Google building, told us we had to

22         get out of Venice because she said homeless people

23         could not live in Venice.  And she and they took our

24         tent, all our belongings, including our clothing and

25         bedding."

1          **MR. YAGMAN:**  Yes.  And the next page as well.

2          **THE COURT:**  Ray White, Jr.

3          "I'm Crystal Finley's husband and she is a plaintiff

4          in this action.  Today, May 7th, at about noon, LAPD

5          Officer Contreras and about 10 other LAPD officers

6          came to where I and my wife, Crystal Finley, were

7          living in a tent in Venice near Rose Avenue and Main

8          Street, across from the Google Building, told us we

9          had to get out of Venice because she said homeless

10         people could not live in Venice and she and they took

11         our tent and all our belongings, including our

12         clothing and bedding."

13         The City represented earlier, at least at the time of

14   the motion to dismiss, a process she described in being able to

15   drop off personal belongings if the homeless called.

16         What number would they call?

17         **MR. KIM:**  That's correct, Your Honor.  The number --

18         **THE COURT:**  I'm sorry.  What number would they call?

19         **MR. KIM:**  It's on the notice that each individual

20   receives, a posted notice.  And in this case for Mr. Jacobs it

21   would be the 213-806-6355 or 844-475-1244 number.  That number

22   is also -- and I'll correct my earlier statement.  That number

23   is actually a number that's on the posted -- permanent posted

24   signage as well, Your Honor.

25         **THE COURT:**  Which number would I call?

1          **MR. KIM:**  One is a toll-free number, Your Honor, and

2    the other is a local 213 number.

3          **THE COURT:**  Call the toll-free number for me on your

4    phone, would you?

5          **MR. KIM:**  Yes, sir.

6      **(Pause)**

7          **MR. YAGMAN:**  Your Honor, I should point out --

8          **THE COURT:**  Counsel, just a moment.  You'll have all

9    day if you want, all night.

10          **MR. YAGMAN:**  I don't.

11          **THE COURT:**  Yes, you do.  Call that number.

12      **(Number Ringing)**

13          **MR. SPEAKER:**  Thank you for calling Unintended

14    Property.  This is John speaking.

15          **MR. KIM:**  Hi.  This is Deputy City Attorney Emerson

16    Kim.  I'm here with Judge Carter down in the Central District

17    court in Santa Ana.  We're just calling this number to confirm

18    that it is an operative number and that someone is picking up

19    the number.  So thank you for your time.

20          **MR. SPEAKER:**  No problem.

21          **THE COURT:**  Oh, tell him you have some property that

22    you need to pick up.  Where would you go to get it?

23          **MR. KIM:**  Yes, sir.  Sorry, he hung up.

24          **THE COURT:**  Call back.

25      **(Number Ringing)**

1              Tell him you're homeless in the City Attorney's

2    Office.  Just joking.

3              Who do you work with?  County or City?

4              **MR. KIM:**  City.

5              **THE COURT:**  I'm just joking.  You're not homeless.

6    But just tell him you have some property you'd like to pick up.

7              **MR. SPEAKER:**  Thank you for calling Unintended

8    Property.  This is Thomas.  How may I help you?

9              **MR. KIM:**  Hi.  Yes.  I'm Deputy City Attorney Emerson

10   Kim.  I'm here with Judge Carter.  We are curious about if an

11   unhoused individual were to call and state that they had some

12   property that is stored at the bin and needs to be retrieved.

13             **MR. SPEAKER:**  Okay.  First of all, they would have a

14   case -- they would have to have a case number.

15             **THE COURT:**  Oh, you do.

16             **MR. SPEAKER:**  They will give us as much information

17   that they have and then we can search our files to see if the

18   property was stored or not and where it is.

19   Tell him you've got a case number and you'd like the property

20   to be dropped off at Pacific Coast Highway and what's a cross

21   street?

22             **MR. SPEAKER:**  And then make an appointment to return

23   it to them.

24             **THE COURT:**  No --

25             **MR. KIM:**  Understood.  And so --

1          THE COURT:  -- no, hold on just a moment.  I have to

2   make an appointment?

3          MR. KIM:  Sorry.  One second.  I --

4          THE COURT:  Yeah.

5          MR. KIM:  -- trying to work with two different dials.

6          THE COURT:  Thank you.

7          MR. KIM:  The question we had was if an unhoused

8   individual --

9          THE COURT:  No, no.  He just said I needed to make an

10   appointment.  Have him repeat that.

11          MR. KIM:  Oh, sorry.  What was the portion about the

12   appointment that you had mentioned?

13          MR. SPEAKER:  I said if their property was stored at

14   any of our locations, we will make an appointment ...

15          MR. KIM:  Okay, great.

16          MR. SPEAKER:  ... with them at a safe spot, yes, and

17   return it.

18          MR. KIM:  Okay.  Understood.  And even if that safe

19   spot is located on the west side near Westminster Avenue

20   Elementary School in Playa Vista?

21          MR. SPEAKER:  I don't know what's over there.

22          MR. KIM:  Okay.  But the point being that there are

23   safe spots other than the bin that Chrysalis is willing to

24   coordinate with an unhoused individual to provide their items,

25   correct?

14

1          **MR. SPEAKER:**  Correct.

2          **MR. KIM:**  Okay.

3          **THE COURT:**  Give a location.  I want -- give me a

4    location.

5          **MR. SPEAKER:**  Yeah.  We have certain -- like Goodwill

6    and recreation center and stuff like that.

7          **MR. KIM:**  Okay.  And what about if I were to give you

8    the cross streets, Westminster Avenue and Main Street in Playa

9    Vista.  I also have an address if that's helpful.

10         **THE COURT:**  Yeah because I'm lame.  I don't walk very

11   well.

12         **MR. SPEAKER:**  I don't know that location.  We

13   wouldn't meet anyone there.

14         **MR. KIM:**  Okay but what would be a safe spot in or

15   around, say, the west side generally?

16         **MR. SPEAKER:**  It depends on where -- it depends on

17   where -- what location the property was taken to.

18         **MR. KIM:**  Okay.  In that case --

19         **MR. SPEAKER:**  So I don't have that.  I don't have

20   that.

21         **MR. KIM:**  Okay, understood.  And that would have to

22   be coordinated with the Los Angeles Sanitation Department,

23   correct?

24         **MR. SPEAKER:**  Correct.

25         **THE COURT:**  Thank you, gentlemen.

1        **MR. KIM:**  Thank you so much for your time.

2        **THE COURT:**  Now call the Los Angeles Sanitation

3   Department for me.

4        **MR. KIM:**  I don't have a direct number.

5        **THE COURT:**  Neither do, I'm homeless now.

6        **MR. KIM:**  Okay.

7        **THE COURT:**  How do I get Los Angeles Sanitation?

8        **MR. KIM:**  Oh, in this case there would be a case

9   number, Your Honor.  He didn't have a case number.  So what

10  would happen is, we'd provide a case number.  This individual

11  would track down where that property is stored in this

12  instance.  It could be in the west side sanitation yard or it

13  could be at the bin.  And of course is my understanding.  And

14  then they would coordinate with the individual at a safe

15  location such as a public location such as a Starbucks or other

16  public areas.

17        **THE COURT:**  Is the ...

18     **(Pause)**

19        In the declaration of Eric Serin, on Page 2 at Line

20  13 through 18, it states:

21        "Only 17 percent of people ever claim their

22        belongings.  As such the City is aware that more than

23        4/5ths, 83 percent of the belongings it confiscates,

24        never are picked up by their owners and ultimately

25        are destroyed after the 90-day waiting period."

16

1          Is there any disagreement between the two of you

2    concerning 17 percent of the people ever claiming belongings?

3          **MR. KIM:**  Your Honor, I haven't verified where these

4    facts have come from, specifically just the statistics.

5    However, I am remembering that we submitted a declaration

6    consisting of certain statistics in our prior motion --

7          **THE COURT:**  Could you help me?  In other words if

8    there's a disagreement about that I'd like to know the

9    percentage.

10          **MR. KIM:**  Your Honor, I can't verify one way or the

11    other what Mr. Yagman has or Mr. Serin is providing here in

12    terms of the data.

13          **THE COURT:**  No I thought the City has additional

14    storage bins located throughout the city but the zone protocol

15    send confiscated belongings solely to the bin.

16          **MR. KIM:**  That is not my understanding, Your Honor.

17          **THE COURT:**  Then explain that to me, please.  I

18    appreciate that.

19          **MR. KIM:**  Yes, Your Honor.  The process that I am

20    familiar with is that there are several yards throughout the

21    city.

22          **THE COURT:**  Where are they located?  I think you'll

23    find that on Page 7 of Document Number 13 -- it's Exhibit E,

24    Document 87-6.  And there it says on Page 7, Line 20:

25          "There are five other storage facilities for

17

1          involuntary storage located in different parts of the

2          city, including the Valley on Pendleton Street,

3          northeast on North San Fernando Boulevard, West LA on

4          Vista Del Mar, San Pedro on N. Gaffey, and Northridge

5          on Vanalden (ph) Avenue."

6          So if your property is located in Venice, where would

7     the confiscated property go?

8          **MR. KIM:**  My understanding -- and I would have to

9     verify this with LA Sanitation is that it would go to the

10    closest yard in proximity.  So it would be the one you

11    mentioned in terms of being on the west side.

12          However, it is also dependent on the time of day.

13    For example, these items may be held there for some time and

14    then ultimately transferred to the bin for recovery and vice

15    versa when someone coordinates a pickup.

16          **THE COURT:**  Okay.  How does a homeless person who is

17    semi-ambulatory go these distances?  Or mentally -- let's say

18    has mental issues?  In other words, I understand the need for a

19    safe location.  We don't want our City workers placed in a

20    situation where they're going into a place where they could be

21    endangered.  By the same token, how are the homeless with

22    mental infirmities or physical infirmities to get to these safe

23    areas?

24          **MR. KIM:**  This is something that I would have to look

25    further into.

18

1          With that being said, my understanding of how safe

2     areas work is that it does not differentiate -- strike that.

3     Let me pause for a second.

4          The safe areas are done in coordination with

5     individuals.  So it would be done in a manner which would be

6     most convenient, yet still safe for personnel to meet with

7     unhoused individuals.  So depend -- I know this is an abstract

8     hypothetical but depending on where these individuals are

9     located, it may be somewhere closer or at their location --

10    that would be my guess -- however, that is my guess and this is

11    something I'd have to talk with a third party such as Chrysalis

12    and their service operators.

13          **THE COURT:**  I appreciate the answer that's ...

14       **(Pause)**

15          You and I cannot control the decisions made by the

16    executive branch.  But it's curious to me why each council

17    district doesn't have a dropoff.  Now, that may not even be a

18    good solution -- which is why I'm not in elective office -- and

19    have the luxury of raising this hypothetical.  But it allows

20    different council districts to -- for want of a better word --

21    "dump," d-u-m-p, for the record, belongings into one council

22    district.  And predominantly that's been the 14th Council

23    District.

24          And it's the same concern I have about the

25    perpetuation of skid row for a minority population who

1   apparently for years we didn't care about because we could

2   warehouse them down there with floodlights and barricades,

3   historically, until it burst out of that enclave.  And I get

4   concerned that the City is doing the same thing by moving

5   belongings.  I get concerned and quite don't know how I'm going

6   to rule yet which is why I'm raising this with both of you.

7   And I'll turn to Mr. Yagman in a moment.

8           And here we have a perpetuation -- and I'll be blunt

9   about it -- the west side of LA -- historically moving people

10  to skid row or their belongings to skid row, out of sight, out

11  of mind.  Now you and I can't remedy that, we're not elective

12  office.

13          And I also understand the cost of that involved.  But

14  it seems to me that these bins could be near every council

15  person's council headquarters.  And your argument should be

16  back to me, Judge, these council districts are so large that

17  how would that possibly be a better methodology than if we are

18  able to have a case number and deliver these pieces of property

19  back to a homeless person in a safe area?  And Judge, those

20  safe areas may in fact be closer to the homeless person at a

21  Goodwill or another location.  But that coordination requires

22  me as a homeless person to keep my date.  Remember, and

23  hypothetically, not very ambulatory and I've got mental

24  disfunction.  And when you set a date with me, I've got a hard

25  enough time keeping an appointment with a social agency of some

1    type for my license or treatment, let alone hooking up with

2    some person in a safe area.

3         Now, I'm assuming something, to your benefit, that

4    that safe area has the benefit of holding that for a period of

5    time.  So if it's a Goodwill, maybe they can hold it.  But what

6    happens if they don't?  What happens if it's a safe area that's

7    a private entity or a supposed safe area like a post office?

8    Are these if I missed my appointment with Chrysalis, are these

9    different locations holding my documents [sic] so in case I'm

10   10 minutes late, as I hobble down the street?  Because

11   remember, I don't have money for bus fare.  Are they holdings

12   these items?  Or if I miss my appointment, for whatever period

13   of time, does my item go back to the bin?

14        **MR. KIM:**  I'd have to speak with the individuals or

15   the Chrysalis.

16        **THE COURT:**  And I don't know.  Here's my worry.  I'm

17   worried that unless I hit it right on the button with a

18   homeless person, you've heard Mr. Yagman say something that all

19   of us know.  It's hard for him to locate his clients to begin

20   with.  Takes a while to get declarations.  And their motivated

21   to cooperate with him.  What I'm worried about is that if we

22   don't have some kind of better procedure -- and I'm not smart

23   enough right now to know what that is -- but once these items

24   are taken they're too far away.

25        And you know I'm deeply concerned and have been

1 writing about this, including to Santa Barbara.  But it just

2 strikes me that even for the community that's not homeless,

3 there's a real concern having a homeless person trek through

4 Hancock Park, Beverly Hills, I can just see the local police

5 department pushing that person out as they try to move in some

6 direct line or down Wilshire Boulevard towards skid row.

7 Frankly, I don't know the answer to it.  I'm not an elected

8 official.  And it's easy for judges to criticize when we don't

9 have to deal with the practical.

10         So two things I recognize.  One, the cost.  If we had

11 a multitude of different locations, how many would we need,

12 Judge, for you to be satisfied?  I don't know.

13         Number two, is your method better through Chrysalis?

14 I don't know.  I'm struggling with it.

15         By the same token, I'll give you the example of

16 Orange County which initially concerned me which has nothing to

17 do with your efforts in Los Angeles which may be much better,

18 much better.

19         Here, on the Riverbed, they actually gave the

20 homeless a bus ticket.  Do you give a bus ticket?

21         **MR. KIM:**  Not that I'm aware, Your Honor.

22         **THE COURT:**  No.  Sounds noble, doesn't it?  Except

23 the bus ticket was down to Lake Forest in South County.  And

24 once you got there, there was no return bus ticket.  So to get

25 your possessions you got deposited in South Orange County which

1    is where you didn't want to be, you wanted to be on the

2    Riverbed.  One way ticket to hell.

3         In Los Angeles, by the same token, you may have a

4    better process and procedure but you may not even be offering

5    the homeless the ability to get there.  And I am concerned

6    about whether Chrysalis really functions.  You say it does but

7    you and I aren't out there as a homeless person making the

8    appointment.

9         Okay.  Now you're off the firing line for just a

10   moment.  You can relax because you can't solve those problem.

11   You're counsel.

12        Mr. Yagman, I struggled.  And that's why it took all

13   morning.  I dragged all the documents out that you cited

14   before.  I frankly admit to you, humbly, I missed a couple

15   things in the declarations.  I hadn't tied it together.

16        I think you ably point out to me that your clients'

17   items are confiscated and taken.  You used the word "stolen".

18   Fine.  But confiscated and taken.

19        **MR. YAGMAN:**  Those are their words, not mine.

20        **THE COURT:**  Okay.

21        **MR. YAGMAN:**  That's how they perceive it.

22        **THE COURT:**  But up to this point I thought that the

23   only location was the bin.  And it states on Eric Serin's

24   declaration on Page 2, at Line 16:

25        "The City had four additional storage areas located

23

1          throughout the city but the zone protocol send

2          confiscated belongings solely to the bin."

3          How do we know that?

4          **MR. YAGMAN:**  He knows it because he's out in the real

5     world, he's surrounded by homeless people and it's common

6     knowledge.

7          **THE COURT:**  Okay.

8          **MR. YAGMAN:**  And he doesn't have the ability to

9     research that.

10         **THE COURT:**  Now, I have to tell you I can't make this

11    part of the record but I'm down on skid row a lot.  I know

12    exactly where the bin is.  And I can tell you that the hours

13    that are represented to pick up aren't necessarily hours that

14    are kept.  And I can't base my ruling on that.  I can't make a

15    record of that and unfortunately it's probably outside this

16    record and probably I shouldn't know that.  But I'm down there

17    a lot on a lot of other cases not involving Mr. Yagman.  But I

18    don't know how much those hours vary.  Do you understand?  So

19    for my purposes I'm going to take the representation that these

20    hours are kept.  Okay?  That's a benefit to the City right now.

21    But I can tell you as a practical matter, so I don't go outside

22    the record, you might go down there and check yourself and you

23    might find out what's being represented to you isn't

24    necessarily credible.  And that's not your problem, okay?

25         I initially had written the following, Mr. Yagman,

24

1   and I'm not sure of what I'm about to read to you.  Can you

2   hear me?

3           **MR. YAGMAN:**  I can now.

4           **THE COURT:**  Can you hear me?  Okay.

5           I'm not sure that I still subscribe to this.  What I

6   originally had written:

7           "Plaintiffs did not submit a statement of genuine

8           disputes of material fact or any evidence other than

9           plaintiffs' declarations to oppose the motion.  The

10          declaration from Plaintiff Serin is at Docket 399 and

11          the declaration from Plaintiff Jacobs is at Docket

12          403.

13          In their papers, including the declarations,

14          Plaintiffs do not dispute any of the facts in

15          Defendants' motion or materials.

16          Of concern to the Court is that no evidence has been

17          submitted about how the bin operates, other than a

18          declaration from Plaintiff Serin.  For example,

19          there's no evidence about whether Plaintiffs tried to

20          arrange for a dropoff of their belongings, rather

21          than pick up as Defendant argues they could have

22          done.

23          Defendant previously submitted a declaration of this

24          procedure at Docket 87-6.  Defendant states that

25          Plaintiff did not engage in discovery.  There's also

1          no information from Defendant about why property is

2          only taken to the bin and not other storage

3          facilities in other parts of the city."

4          Now hold on.

5          I meant for the record that you may be absolutely

6   right that these documents solely go to the bin, overloading

7   Council District 14, so the City is dumping again and forcing

8   homeless into one council district as they have historically

9   done, or they may have four other districts, as is cited in

10  Document Number --

11          (Pause; Court confers with Clerk)

12          -- in Document 87-6, at Page 7, where you state:

13          "There are five other storage facilities for

14          involuntary storage located in different parts of the

15          city, including the Valley on Pendleton Street,

16          northeast on North San Fernando Boulevard, West LA on

17          Vista Del Mar, San Pedro on N. Gaffey and Northridge

18          on Vanalden Avenue."

19          The inference that you're asking me to draw is that

20  these confiscated items are taken to any one of five locations,

21  including the bin.  Is that correct?

22          **MR. KIM:**  Yes, Your Honor, with the caveat that it

23  would be the closest location to where the items were picked

24  up.

25          **THE COURT:**  How do I know that?  In other words, that

26

1    would be a benefit I would think to the City because my idea of

2    every council district versus a larger area.  I may be wrong.

3          **MR. YAGMAN:**  But how does Mr. Jacobs --

4          **THE COURT:**  Hold on.  I'm speaking to Counsel.  You

5    can have all day and all night if you want.

6          **MR. KIM:**  Yes, Your Honor.  This is meant to

7    highlight the logistical side of how LA Sanitation transfers

8    items.  So, as I mentioned earlier, if a cleanup was in the

9    Valley, at a certain time it would be taken to the Valley yard.

10          **THE COURT:**  If I have a quandary, if I can tell

11    between the two, is that a material issue of fact?

12          **MR. KIM:**  No, Your Honor.  In this case specifically

13    pertain to Plaintiffs Jacobs and Serin.  There is no allegation

14    that they even engaged in the process to recover their items.

15    In fact, the facts that we have submitted show that perhaps at

16    least with Mr. Jacobs in Mr. Jacobs' case, he may have

17    intentionally left his items to be cleaned up in the middle of

18    the street, despite being told not to.

19          **THE COURT:**  And so what happens if there was a new

20    declaration, hypothetically from Mr. Jacobs, playing this out

21    for a moment, and he said, you know, I called the bin, they

22    arranged a location but I couldn't get there at that time.  Now

23    what does the Court do?

24          **MR. KIM:**  You know, Your Honor, that would be a

25    difficult question to answer in that instance but at the same

27

```
 1   time --
 2           THE COURT:  Now hold on.  Another hypothetical.
 3           We're not sure of a safe location and you say,
 4   Mr. Jacobs or Mr. Serin, that you can only pick it up at night
 5   because you're applying for a job and going to different social
 6   service agencies.  You're not available.  Now what do we do?
 7           MR. KIM:  I'd have to ask Chrysalis and those
 8   involved in terms of the hours of operation to coordinate a
 9   dropoff.
10           THE COURT:  Now either one of the gentlemen,
11   hypothetically say, I'd like to come down and get it, in fact
12   it's cost effective.  Can I have bus fare?  In other words, it
13   may cost more to send our City workers out to a location to try
14   to marry up at a specific time but instead Jacobs or Serin
15   says, you know, I just need a couple bucks for the bus.
16           MR. KIM:  I believe, again, this is not something
17   that I am aware of that is part of the process but --
18           THE COURT:  Well, didn't Orange County offer bus
19   fare?  One way bus fare.
20           MR. KIM:  Yes, Your Honor.
21           THE COURT:  I'm not suggesting you do but what do we
22   do then?
23           MR. KIM:  Right.  In this instance, again, because
24   Chrysalis is the entity that coordinates the dropoff, it isn't
25   so much that the City will get involved and provide a fare but
```

28

1    it's not something that I'm aware of that occurs but I would

2    need to confirm with --

3            THE COURT:  Don't worry about it.

4            Now I have concerns, hypothetically, about Chrysalis.

5    Okay?  And these concerns are as follows:

6            Maybe they're a great agency and maybe they're

7    worthless.  And maybe they deliver on some occasions that I can

8    be shown but they don't deliver on other occasions -- Is that -

9    - to the homeless person.  In other words, it works part of the

10    time.  Let's just say it works 50 percent of the time.  Is that

11    a material issue of fact?

12            MR. KIM:  Here, Your Honor, it's difficult to answer

13    because there's no --

14            THE COURT:  I know.  I'm struggling with it too.  If

15    I had the answers I wouldn't be asking the questions.

16            MR. KIM:  It would definitely think it would be fact

17    dependent in this case.

18            THE COURT:  And let's assume that you're not the evil

19    doer, that you're genuinely trying to get your items back to

20    the homeless, commendably so.  I don't know that it's the

21    Court's position that I am supposed to construct a better

22    system and act in a executive role.  I don't think it is.  The

23    question is, though, are we putting obstacles in the way so a

24    better system can be created by the executive branch however we

25    measure that?  Good, not perfect.  So that the homeless have

1    access to the belongings that after all were seized from them

2    and in good faith.

3            (To Clerk):  Now, do we have that tape for a moment?

4        (Court confers with Clerk)

5            I'm going to play a tape for a while.

6        (Court confers with Clerk)

7            Okay.  Karlen will be back in a while.  Let's hear

8    from Mr. Yagman.  Now, Mr. Yagman, I'm going to turn this over

9    to you and I'll continue to read for just a moment so you know

10   my concern then I'm going to give you an opportunity.

11           "Plaintiffs have submitted various opposition papers

12           but none of these contain --

13           Can you hear me?

14           **MR. YAGMAN:**  Yes.

15           **THE COURT:**  Okay.

16           "-- substantive legal arguments directly addressing

17           Defendants' arguments in the motion for summary

18           judgment.  Plaintiffs make various procedural

19           arguments about why the motion should be denied or

20           not heard, including that the meet and confer

21           requirement was allegedly not followed.

22           Plaintiffs at Docket 401 briefly discussed a Northern

23           District of California order on a motion to dismiss

24           about the Supreme Court's Grants Pass decision.  But

25           Docket 401 also does not engage with Defendants'

1                arguments substantively.  It only states that Grants

2                Pass invalidates the Eighth Amendment excessive fines

3                claim but not the other claims.  Plaintiffs mention

4                Fourth Amendment claims but those have been

5                previously dismissed in this case as confirmed at

6                Docket 333.

7                Here, the Court certified a class represented by

8                plaintiffs Serin and Jacobs.  Finley is no longer a

9                plaintiff as confirmed in the order on class

10               certification at Docket 365 on Page 7.  The remaining

11               claims are the Eighth Amendment cruel and unusual

12               punishment claim, the Eighth Amendment excessive

13               fines claim, the Fourteenth Amendment procedural due

14               process claim, and the Fourteenth Amendment

15               substantive due process claim."

16               Now I want to take one at a time for a moment.

17               Is it an Eighth Amendment cruel and unusual

18       punishment if your clients have a system of returning property

19       but it's not functional?  In other words, the intent of the

20       City is genuinely to return these pieces of property to your

21       client.  We take away the evil doer for a moment.  But it is a

22       dysfunctional system.  It is a system that requires a safe site

23       or certain hours to marry up so it's not the evil person that

24       hypothetically you're involved with who's trying to keep the

25       items from your property, it's a dysfunctional system.

1          Is that an Eighth Amendment cruel and unusual

2    punishment?

3              **MR. YAGMAN:**  Yes.

4              **THE COURT:**  Okay.  Now use the microphone and tell me

5    why.

6              **MR. YAGMAN:**  You know, we and the City government who

7    at absolute best are engaging in deny and neglect, they don't

8    really want to deal with homeless people.

9              **THE COURT:**  No, I took away the evilness of that now.

10   I've put you in a different position.  I know you're going to

11   argue they're barbarians, you know, the gates, et cetera.  Not

12   interested in that argument.  That's great in front of a jury.

13   What I'm interested in is, I'm assuming now in this

14   hypothetical that they're not evil doers, that they genuinely

15   don't want these lawsuits, that they genuinely want to return

16   the product to your client but it's dysfunctional.

17             **MR. YAGMAN:**  I don't accept that assumption.

18             **THE COURT:**  Well you're going to have to for my

19   hypothetical.  I might find against you.  Now answer my

20   question.

21             **MR. YAGMAN:**  It was a comma after that.  I don't

22   accept that --

23             **THE COURT:**  No.  Answer my question.  You're treading

24   on dear waters with me, I don't argue with you.  I'm asking you

25   to answer my question.  I'm engaging you now in good faith.

32

1          **MR. YAGMAN:**  The question is, is what they're doing

2    cruel and, conjunctively, is it unusual?  Of course it's cruel.

3    Look at what's going on.  There are 45,000-some-odd homeless

4    people on the street of Los Angeles and the City is going

5    around, interestingly, through the sanitation department, the

6    department that picks up garbage, and they are irrationally

7    seizing the property of people and it is unusual.

8          **THE COURT:**  Now, I'm going to ask you, are there

9    guidelines that you know of that they operate under?  Because

10   here, you may be right.  What they've given is permission to a

11   19 year old to 48 year old garbage person to choose what

12   they're going to take.  Are there guidelines that you know

13   about that the City has enacted to guide our garbage collectors

14   when they confiscate property?

15         **MR. YAGMAN:**  I know of none but I do --

16         **THE COURT:**  Just a moment.  Counsel, do you know of

17   any guideline that the City has for sanitation workers so that

18   our garbage person who's picking this up has some guideline?

19         **MR. KIM:**  First of all, Your Honor, yes, for an

20   answer.  Secondly, these aren't the same workers who are

21   operating the refuse truck collections.

22         **THE COURT:**  Just a moment.  Are you sure about that?

23         **MR. KIM:**  These are environmental compliance

24   inspectors, Your Honor.  They have specific training to deal

25   with certain situations of identifying hazardous materials,

33

1    including sharps, feces, urine, Your Honor.  This is a key

2    focal point in terms of what the City does when it cleans a

3    certain area of the city.  And in this case, one underlying

4    assumption is that these individuals choose on behalf of

5    unhoused individuals what amongst their belongings must be

6    destroyed.

7            **THE COURT:**  Well unrelated to this record you just

8    had a sweep in skid row where everything was swept up,

9    including tents, right before the rain.  Did you know that?

10           **MR. KIM:**  I was not aware of that, Your Honor.

11           **THE COURT:**  Well, our City inspectors out there

12   probably didn't do a very good job.  And unrelated to this

13   record so I can't make that a part of my findings I'll take you

14   down to skid row.  Have you talk to the people down there.

15           **MR. KIM:**  I have not; however, Your Honor, one thing

16   about rainy weather is the risk of mold and mildew that does --

17           **THE COURT:**  How about the rain dropping on your head?

18   So that moldy, misty tent -- now, can't be part of my record,

19   okay?

20           **MR. KIM:**  Understood, Your Honor.

21           **THE COURT:**  But unfortunately I'm around this city a

22   lot and unfortunately -- I'm not saying there aren't inspectors

23   there on occasion but I am saying that there are wholesale

24   sweeps going on and there was just a demonstration down on skid

25   row about a month ago over it because everything was swept up,

34

 1    including tents.  And that wasn't selective, that was across

 2    the board.

 3              **MR. YAGMAN:**  And that was the case with Mr. Jacobs.

 4    I'd like to be case-specific for a moment.

 5              Mr. Jacobs is schizophrenic, he's functioning and

 6    he's got no watch or clock.  When he was grabbed up he was

 7    charged with some penal code violation.  They held him in jail

 8    for 60 days and then when he came to court the charges were

 9    thrown out.  So that took away 60 of his 90 days to do

10    anything.  If he goes away from where he lives in his tent,

11    someone will grab it and scatter it and its contents everywhere

12    as happened about two months ago.  Some local vigilantes did

13    that.  He's got no phone, he's got no money, he can't leave his

14    home to go anywhere because when he gets back it won't be

15    there.

16              So, with respect to Mr. Jacobs, is what Officer

17    Contreras did to him -- and this is in the other case that you

18    just took --

19              **THE COURT:**  From Judge Birotte?

20              **MR. YAGMAN:**  24-9320 or 90 -- the one from Judge

21    Birotte.

22              **THE COURT:**  Yeah.

23              **MR. YAGMAN:**  That's what happened in that case just

24    last September.  He spent September and October in jail.  His

25    belongings were taken, nobody told him where they were taken,

35

1    they were destroyed.  He had to reestablish a home in a tent

2    and he did it a block away.

3           When you're case-specific to something like that,

4    it's cruel and unusual punishment.  Who does something like

5    that?  I mean we've here in this ivory tower with the paneled

6    walls that must have cost a million dollars to build this

7    courtroom and Mr. Jacobs is on a highway to hell, to quote

8    AC/DC.  It's horrible.  Who does something like that to them.

9    And you know, they're kind of washing their hands and we have

10   these protocols.  The protocols don't work, they're cruel and

11   unusual.

12           **THE COURT:**  Well that's my question.  I'm past the

13   point in this hypothetical of the cruelness that you refer to

14   in just taking the items.  The City may have the right to

15   claim, may have the right to take certain items.  I keep coming

16   back to the backside of this and that is a well-intentioned

17   city, which you'll disagree with but this is my hypothetical.

18   I'm not making that finding that they're well-intentioned.  But

19   a well-intentioned city, the best scenario for them and asking

20   if this is a dysfunctional system and if that makes this cruel

21   and unusual under the Eighth Amendment?

22           **MR. YAGMAN:**  Since they know it doesn't work of

23   course it makes it cruel and unusual.  They know better and

24   they're glossing the whole thing and trying to paper it over.

25   And they turn it over to the lawyers and then the lawyers --

36

1          **THE COURT:**  But your argument would be, as an

2   advocate, the City shouldn't even take items from a homeless

3   person.

4          **MR. YAGMAN:**  Not as an advocate, as a human being.

5          **THE COURT:**  Okay.  Now, you as the City have rights

6   to clean for health and safety purposes.  You have rights to

7   get the rats off the street and the feces.  And until Covid

8   came along, some of that process and procedure was working very

9   well.  Covid changed the scenario because everybody was afraid

10  to go down to skid row and clean so they thought it was better

11  that everybody live in filth with rats and a sewer running down

12  the street -- streets, plural, not street.

13         Also, the homeless were concerned about what I call

14  "the stringency of the City" and their ability to set up tents

15  I think from 8:00 o'clock at night, maybe 10:00, till 5:00 or

16  6:00 in the morning, and then they were to be off the sidewalk

17  and clear.  Because of the volume of homeless, at least in skid

18  row, it was a joke.  Nobody could enforce it.  And I don't

19  think anybody wanted to enforce it because the homeless just

20  would just mill around.

21         Why is this a excessive fines claim under the Eighth

22  Amendment, Mr. Yagman?

23         **MR. YAGMAN:**  Because the property has value and

24  taking it, arguably, imposes an excessive fine where there

25  shouldn't be a fine at all.

1          **THE COURT:**  You may not know this and you may not

2    have asked but do you know if Mr. Serin or Mr. Jacobs made any

3    attempt to return their property?

4          **MR. YAGMAN:**  I don't know.

5          **THE COURT:**  Okay.

6          **MR. YAGMAN:**  I don't believe so.

7          **THE COURT:**  Okay.  But just don't know at the present

8    time.

9          And that's your argument from the City is that they

10   didn't even try.

11         **MR. KIM:**  One of our arguments, yes, Your Honor.

12         **THE COURT:**  Okay.  Fair enough.  If they had tried,

13   what would your position be?  And something happened?  You

14   know, I've given you a hypothetical again of they didn't marry

15   up at the exact time on the exact safe location or street

16   corner, nor were they given bus fare to go down to the bin.

17         **MR. KIM:**  So for Mr. Jacobs, as I mentioned in the

18   briefing for Mr. Serin, a lack of allegation that a cleanup

19   even occurred here.  For Mr. Jacobs the focus really does come

20   down to, as we submitted to this court, that he had more than

21   adequate opportunity prior to the cleanup to move his

22   belongings.  He had more than adequate opportunity during the -

23   - 15 minutes during the commencement of the actual cleanup once

24   the teams had arrived.

25         **THE COURT:**  Now we've got a tape of that, don't we?

38

1          **MR. KIM:**  Yes.

2          **THE COURT:**  We're going to play that.  Karlen, could

3    you be kind enough?  We're going to play that.

4          And folks, we'll be with you by midnight tonight.

5    I'm just joking with you.  We'll get to you, I promise you,

6    right after we're done with this case.

7          So we're going to put this up for just a moment

8    because tentatively, I'm going to let Mr. Yagman argue but it

9    seems that notice was given.

10     (Pause; Court confers with Clerk regarding playing audio)

11          Let's put this up.  About 15 minutes.

12          Now, Mr. Yagman, if your position is that there's not

13   sufficient notice.  I know your initial position is that they

14   shouldn't even be doing this, it's inhumane.  And I think

15   that's a losing argument.

16          I'm going to ask you to look at this tape again with

17   me and with Counsel.  We've got all day and night.  We're going

18   to put it up.  If you can't hear, don't worry about formality,

19   just come up closer, okay?  But I'm going to ask you what's

20   wrong with the notice provisions here.

21          **MR. YAGMAN:**  Will it come on the screen here?

22          **THE COURT:**  Oh, yeah.  It's gonna be magic.  Called

23   electronics.

24          **MR. YAGMAN:**  And of what is this a tape?

25          **THE COURT:**  Same tape that both of you submitted to

1    me and you should have looked at.  So before you ask a dozen

2    questions, we're going to see the YouTube that was submitted to

3    me.

4              **MR. YAGMAN:**  I didn't submit this.

5              **THE COURT:**  I know.  The City did.  And excellent

6    counsel that you are, I'm sure you've seen it before but I'm

7    going to be sure by playing it, just in case you haven't.

8              Thanks Karlen.  Okay, Karlen, we'll need sound.

9    Really appreciate it.  Got to hear the sound.

10             **MR. KIM:**  It'll kick in after a few second.

11             **THE COURT:**  Okay.

12        (Pause; Video played at 1:09 p.m.)

13        (Pause; Counsel and Clerk confer about video)

14             **THE COURT:**  And don't stand on formality.  If you can

15   come up.  I want to make sure we don't miss any of the sound.

16             **MR. KIM:**  Certainly.

17             **THE COURT:**  We're okay so far with no sound.  You'll

18   have a memory of this.  Still no sound?

19             **MR. KIM:**  Right.  The way the body worn videos work

20   is that they run on a continuous loop and the officer has to

21   trigger the --

22             **THE COURT:**  Sure, I know.  Yeah.  I just want to make

23   sure that we're doing it correctly here in court.

24             **MR. KIM:**  If you skip ahead to say the two-minute

25   mark --

1          **THE COURT:**  Oh, no, no, no.  This is fun.  Let's

2   watch it.

3          No, Karlen, go right back there.  We're going to

4   watch the whole thing.

5          **MR. KIM:**  There should have been sound.

6          **THE COURT:**  Because eventually you're going to point

7   out to me the certified person.  I see a lot of police officers

8   but I'm looking for that certified, qualified person that you

9   mentioned.

10     (Pause; Video continues playing)

11         Now, this isn't Mar Vista, is it?  No, that's not Mar

12  Vista.

13     (Court and Clerk conferring)

14         SPEAKER:  (inaudible).

15         **THE COURT:**  Yeah, come on up.  Don't worry about

16  formality.

17     (Video still playing)

18         Should be on.  Would you help Karlen then.  Sound

19  should be on.

20     (Pause; Video still playing)

21         Karlen, turn it up as loud as you can.

22     (Video still playing)

23         **MR. YAGMAN:**  This is Venice and that's the dog park.

24     **(Video playing)**

25         **MR. YAGMAN:**  And right there is where Mr. Jacobs

41

1  lives.

2      (Video still playing)

3          **MR. KIM:**  The first few minutes do not concern

4  Mr. Jacobs, just letting you know.

5      (Video continuing)

6          **MR. YAGMAN:**  That's Mr. Jacobs.

7      (Video continuing)

8      (Video stopped at 1:24:08)

9          **THE COURT:**  Mr. Yagman, is your opinion, was adequate

10 notice given?

11         **MR. YAGMAN:**  No.

12         **THE COURT:**  Why?

13         **MR. YAGMAN:**  Because no notice was given to

14 Mr. Jacobs.  That's why.

15         **THE COURT:**  Was adequate notice given by the City?

16         **MR. KIM:**  Yes, Your Honor.

17         **THE COURT:**  What was that notice?

18         **MR. KIM:**  Both in the form of permanent postage as

19 well as the ECI who arrived at the scene and providing him

20 further 15 minutes, Your Honor.

21         **THE COURT:**  And what does the permanent posting say

22 once again?  Remind me.  Refresh my recollection?

23         **MR. KIM:**  Every Thursday is that there's a

24 comprehensive cleaning.

25         **THE COURT:**  And was this a Thursday?

42

1          **MR. KIM:**  Yes, Your Honor.

2          **THE COURT:**  Was it within the hours posted?

3          **MR. KIM:**  Yes, Your Honor.

4          **THE COURT:**  What additional efforts did you make, if

5     any?

6          **MR. KIM:**  Also, Your Honor, as you heard, Mr. Jacobs

7     is a known fixture in that location and so he's had more than

8     one interaction with both the --

9          **THE COURT:**  That's not my question.  I know you

10    posted, I know he's a known fixture, that's not my issue.

11         Did you take any other action to notify him?

12         **MR. KIM:**  Yes, Your Honor.  Like I said, the ECI

13    who's there gave him advanced notice, gave him more than 15

14    minutes, Your Honor.

15         **THE COURT:**  Okay.

16         **MR. YAGMAN:**  Your Honor, what's the source of this

17    tape?  I'm just curious.

18         **THE COURT:**  Well it's a bodycam.

19         **MR. YAGMAN:**  Yeah but how did it get to the Court?

20         **THE COURT:**  It was submitted as an exhibit.

21         **MR. YAGMAN:**  When?  I've never seen this before but

22    that's fine.  I've seen it now but I'd just like to know where

23    it came from.

24         **(Pause)**

25         **THE COURT:**  It was lodged, Docket 396.

1          MR. YAGMAN:  On what date, please?

2          THE COURT:  November 18th, 2024.

3          MR. YAGMAN:  And was it physically served on me?

4    Because it would have had --

5          THE COURT:  I don't know.

6          MR. KIM:  Yes, Your Honor, it was.

7          THE COURT:  Was it?

8          MR. KIM:  Yes, Your Honor.

9          THE COURT:  Okay.  Well you two can haggle that out.

10   That's why I'm glad we're looking at it all at the same time,

11   okay?

12         MR. YAGMAN:  I want to make two comments on that tape

13   and they're these.  And they're not legal comments --

14         THE COURT:  Okay.

15         MR. YAGMAN:  -- they're just human comments.

16         Look at how they treated him, like he was a piece of

17   crap, like he didn't matter, like he wasn't a human being.

18         THE COURT:  You need to use the microphone because

19   we're on CourtSmart.  Just lean closer.

20         MR. YAGMAN:  Look at how they treated him, like he

21   was a piece of crap, like he wasn't human and like he was

22   worthless.  And look at all the cops around that.  It's like a

23   Gustavo operation.

24         Second, I've lived in Venice for 41 years.  I have

25   never, ever seen a sidewalk cleaned there and seen workers come

44

1    around and pick stuff up.  People down there sweep their own

2    walk streets and sweep their own sidewalks.  I've never in 41

3    years seen a sidewalk cleaning.

4            I put to the Court that this cleaning is pretextual

5    to get rid of homeless people.  There's no other way to look at

6    it.  We can't sit here in an ivory tower and give the city

7    council and the mayor the benefit of the doubt when you see

8    operations like this going on.  They're horrible and they're

9    offensive.

10           **THE COURT:**  Now, I want to go back to the bin.

11           You've heard from the very beginning on the motion to

12   dismiss that the Court's been concerned about the homeless to

13   retrieve items.  So if you didn't prevail on that at summary

14   judgment, that leaves the issue of the bin and the ability or

15   an inability of your clients and other clients to retrieve

16   their personal effects.  Now if they can't retrieve them it's

17   devastating because it takes time to get a license back or

18   medication back, I understand that.  Or a social security

19   number or a DD214.

20           And my quandary is, now, do you want to do any

21   additional briefing?

22           **MR. YAGMAN:**  If the Court thinks it would be helpful.

23           **THE COURT:**  I think it would be helpful from both of

24   you.  The case got a little bit disjointed because

25   nonappearance before by City -- which I would have had these

45

1  arguments at that time and we would have been farther along --

2  and then I think, bluntly, some incompleteness or the

3  scattering of the documents which has made it hard for me to

4  absorb.  And with my apologies.  I've really tried to get all

5  of the things together which is why we took extra time this

6  morning.

7         I would appreciate simultaneous briefing on these

8  issues.  I don't care about page limitation but I would think

9  that it would be simultaneous briefing within a week to two

10  weeks, your convenience.  So why don't each of you discuss this

11  with each other courteously.  I don't know your schedules.

12  Give me a time period.  What do you want?  Twenty-five pages,

13  50 pages?  I don't care.

14         **MR. YAGMAN:**  I don't care either.

15         **THE COURT:**  What do you want for the City?

16         **MR. KIM:**  Your Honor, I believe it's been thoroughly

17  briefed so something short such as five or 10 pages would be

18  sufficient.

19         **THE COURT:**  No, 25.  I love to read.  Twenty-five

20  pages.  That way if you want to do five or 10 pages, it's fine

21  but I'm not limiting you.  If you want to have 25 pages, it's

22  great.  And if you go a little bit over that, I don't care.

23         **MR. YAGMAN:**  How about February 15th?

24         **THE COURT:**  Perfect.  Would that work for you?

25         **MR. KIM:**  Yes, Your Honor.

1          **THE COURT:**  Okay.  That gives you one more shot.  It

2    lets you, Mr. Yagman, pull kind of this disjointedness together

3    and it lets you come right back and say, Judge, look, notice

4    provisions, we gave them.

5          But you know I'm -- even if you prevail on that, I'm

6    looking at that bin.  I'm really concerned about it, okay?

7          **MR. KIM:**  Yes, Your Honor.

8          **THE COURT:**  And I can't dictate to the City but it

9    just seems to me that from the very beginning I've been

10   concerned but give you a chance to go back and get another

11   affidavit also.  Go back and ask Jacobs and Serin because

12   you've heard the City's argument.  The City's argument is they

13   never made an effort.  I don't know if that turns the case or

14   not but you maybe haven't talked to your clients enough about

15   it.  Maybe go back and talk to them.  I don't know what they

16   did.  Don't make it up, by the way -- not you, but them -- but

17   let's find out.

18         **MR. YAGMAN:**  Your Honor, could the Court please do

19   what it did in the Alliance case and that is order the

20   preparation of the transcript --

21         **THE COURT:**  Absolutely.

22         **MR. YAGMAN:**  -- at government expense and have it

23   placed on the docket?

24         **THE COURT:**  Ahh, I'm not going to saddle the

25   government.  Can't we just do --

47

1              Karlen, well, how do we do that without costing?

2         (Pause; Court and Clerk confer)

3              I think that we can do the same thing we did with the

4    Alliance case.  We don't think we're billing either party.  I

5    perceive this -- I perceive homeless cases to be public cases

6    for want of a better word and you shouldn't be paying and I

7    don't know if the City should be paying but I don't want the

8    Court reporters out of pocket but I think --

9              **THE CLERK:**  It would be at the district court's

10   expense.

11             **THE COURT:**  Yeah, district court's expense.  Let's

12   see what my administration has to say about that, okay?

13             Counsel, we're going to tentatively make at the

14   district court's expense.  Now I may get a call.

15             **MR. YAGMAN:**  Do what you did in the Alliance case.

16             **THE COURT:**  Well let's do it again.  That way it

17   doesn't cost either one of you money, okay?  We'll get

18   transcripts prepared.

19             I may invite you back in for additional argument, I

20   don't know, but I may not, okay?

21             **MR. YAGMAN:**  But if you do, can you do it in the

22   afternoon?

23             **THE COURT:**  Sure.  Sure, absolutely.

24             **MR. KIM:**  One housekeeping matter, Your Honor.

25             **THE COURT:**  Just remind me.

48

1          **MR. KIM:**  Trial date is set in March, given the --

2          **THE COURT:**  That's why I'd like to get to this.

3          **MR. KIM:**  Okay, understood.  But there are a few

4     deadlines coming up regarding pretrial filings --

5          **THE COURT:**  Yeah.  Hopefully the two of you talk to

6     each other.  Mr. Yagman doesn't like to talk to you but he

7     might on this occasion, just courteously to work out dates that

8     work for both of you.

9          **MR. KIM:**  Understood.  Thank you.

10         **MR. YAGMAN:**  I do like to talk to him.

11         **THE COURT:**  Good.  He's a nice person.  Why don't you

12    go talk to him.

13         **MR. YAGMAN:**  I will.

14         **THE COURT:**  Okay.  And you both have a good day.

15    Thank you for your patience with me.  I'm sorry I took you

16    through the lunch hour but it's better than bringing you back

17    at 3:00 o'clock, okay?

18         **MR. KIM:**  Thank you, Your Honor.

19         **THE COURT:**  Okay.  We'll see.

20         **(Proceeding adjourned at 1:32 p.m.)**

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    February 8, 2025

            Signed                                        Dated


                    *TONI HUDSON, TRANSCRIBER*